**UPPER GWYNEDD TOWAMENCIN MUNICIPAL AUTHORITY,**
Petitioner

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION,**
Respondent.

**Lower Salford Township Authority,**
Petitioner

v.

**Department of Environmental Protection, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2010.

Decided Nov. 30, 2010.

Paul A. Logan, King of Prussia, for petitioner, Upper Gwynedd Towamencin Municipal Authority.

Steven A. Hann, Lansdale, for petitioner, Lower Salford Township Authority.

William H. Gelles, III, Norristown, for respondent.

BEFORE: LEADBETTER, President Judge, and BROBSON, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge BROBSON.

In these consolidated petitions for review, petitioners Upper Gwynedd Towamencin Municipal Authority (UG) and Lower Salford Township Authority (LS) (collectively, where appropriate, "the Authorities") challenge orders of the Environmental Hearing Board (EHB) relating to the Authorities' applications for recovery of attorneys' fees and costs (fee applications) from the Department of Environmental Protection (DEP). EHB (1) denied the Authorities' fee applications under Section 307(b) of the Clean Streams Law (Law),[1] and (2) denied the Authorities' request for reconsideration of EHB's order denying their fee applications.

## I. BACKGROUND

### A. Statutory Background

This matter arises under Section 303(d) of the federal Clean Water Act (Act), 33 U.S.C. § 1313(d), which provides in pertinent part:

> (d) Identification of areas with insufficient controls; maximum daily load; certain effluvient limitations revision.
>
> (1)(A) Each State shall *identify* those waters within its boundaries for which the effluent limitations required by section 301(b)(1)(A) and section 301(b)(1)(B) are not stringent enough to implement any water quality standard applicable to such waters ...
>
> (C) Each State shall *establish* for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the *total maximum*

---

1. Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. § 691.307. This Section provides that "[a]ny person having an interest which is or may be adversely affected by any action of the department under this section may proceed to lodge an appeal with the Environmental Hearing Board ... The ... Board, upon the request of any party, may in its discretion order the payment of costs and attorney's fees it determines to have been reasonably incurred by such party in proceedings pursuant to this act."

*daily load,* for those pollutants which the Administrator identifies under section 304(a)(2) as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality....

(2) Each State shall *submit* to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 304(a)(2)(D), for his approval the *waters identified and the loads established* under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this subsection. *The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission.* If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.

(Emphasis added.)

Thus, the Act vests with each state numerous responsibilities, including the establishment of water quality standards for bodies of water within the boundaries of the state. The Act requires states first to evaluate the use of a body of water. Based upon the particular use of a body of water, such as recreation or consumption, the state must then determine the water quality standards the body of water must meet in order to serve the designated use.[2] Part of the evaluation of these standards involves determining the maximum amount of various pollutants the body of water may contain before its designated use is impaired.[3] The amount of permitted effluents is referred to as "total maximum daily load" or TMDLs.

Section 303(d) of the Act, which is at issue in this case, requires states to perform two key functions: (1) to create a list of bodies of water within a state that do not meet established water quality standards—a "303(d) list," which the Environmental Protection Agency (EPA) may approve or disapprove; and (2) to establish, for each body of water on its 303(d) list, TMDLs. As with the 303(d) list, EPA has the power to approve or disapprove a state-established TMDL for a particular body of water. Under Section 303(d) of the Act, EPA must establish a TMDL if it disapproves a state-established TMDL.

**B. Historical Background Regarding Pennsylvania's Compliance with the Requirements of Section 303(d) of the Act**

In January 1996, the American Littoral Society and the Public Interest Research Group of Pennsylvania filed a complaint in the United States District Court for the Eastern District of Pennsylvania. (See Consent Decree; Lower Salford Township Authority Reproduced Record (L.S.R.R.) at 295a–331a.) The lawsuit sought to chal-

---

**2.** 33 U.S.C. § 1313(c)(2)(A).

**3.** 33 U.S.C. § 1313(d)(1)(C).

lenge the alleged failure of EPA to comply with its responsibilities under Section 303(d) of the Act. (*Id.*)

The parties in that case reached an agreement, the terms of which were incorporated into a Consent Decree. (*Id.*) The Consent Decree set forth a process by which EPA could ensure compliance with the Act's directive for the identification of bodies of water for placement on the 303(d) list and the establishment of TMDLs for those water ways. (*Id.*) The Consent Decree appears to provide broad power to EPA to establish TMDLs when a state has been unable to or is incapable of establishing TMDLs. (*Id.*)

■ In 1997, as a means of complying with its responsibilities under the Consent Decree with regard to Pennsylvania, EPA entered into a Memorandum of Understanding (MOU) with DEP. (L.S.R.R. at 507a–512a.) The MOU acknowledged that DEP has lead responsibility *under Section 303(d) of the Act* to identify bodies of water to be placed on the 303(d) list and to establish TMDLs. (L.S.R.R. at 508a, Preamble to MOU.) The MOU also provides that "DEP, subject to available resources, will use its best efforts to work with EPA to establish required TMDLs for [bodies of water on the list] within ten years of the execution [of the MOU]." (L.S.R.R. at 509a; MOU, Section IV(C).)

Further, the MOU provides that "DEP's performance of Section IV(C) is contingent on EPA providing DEP the necessary assistance to enable DEP to become technically proficient … to prepare TMDLs." (L.S.R.R. at 509a; MOU, Section IV(E).) Section IV(F) of the MOU is also significant in that it provides that "[a]t the request of EPA, DEP will share any existing and readily available water quality related data with EPA *to assist EPA in establishing TMDLs for [303(d) water ways].*" *Id.* (Emphasis added.) These provisions of the MOU demonstrate that, although EPA and DEP understood the primary roles the Act vests with states, DEP and EPA anticipated that circumstances might warrant EPA's assuming the primary responsibility for establishing TMDLs.[4]

### C. The Issuance of the TMDLs for Skippack Creek

A document identified as "Total Maximum Daily Load for Skippack Creek" (hereafter EPA TMDL Document) indicates that the TMDLs set forth in the document were "established April 8, 2005." (L.S.R.R. at 2a–219a.) The EPA TMDL Document, generated by EPA, is signed on the front page by Jon Capacasa, as Director of the Water Protection Division of EPA, Region III.[5] (L.S.R.R. 2a.) The EPA TMDL Document includes sections

4. We also note that there is federal case law holding that, notwithstanding the terms of the Act directing states to establish TMDLs, the EPA has a mandatory duty to establish a state's TMDLs when a state has failed over a long time period to submit TMDLs to the EPA. Such inaction on the part of a state may constitute a " 'constructive submission' of an inadequate TMDL, thus triggering the EPA's duty" under the Act to establish TMDLs for the state. *City of Arcadia v. EPA*, 411 F.3d 1103, 1106–07 (9th Cir.2005) (citing *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 880–84 (9th Cir.2002)). Although holdings of federal courts generally are not binding on this Court, we may accept them as persuasive authority.

5. The EPA also sent a letter to DEP on April 8, 2005, which begins by stating that "[t]he U.S. [EPA] *is establishing [TMDLs]* for the Skippack Creek Watershed … These TMDLs were established in accordance with Section 303(d)(1)(C) and (2) of the Clean Water Act to address impairments of water quality as identified on Pennsylvania's 1996, 1998, and 2002 Section 303(d) lists. The TMDLs address the following impairments…." (Upper Gwynedd Municipal Authority Reproduced Record (U.G.R.R.) at 325a; emphasis added.)

identifying problems, assessment of sources of pollutants, sediment TMDL development, and nutrient TMDL development for Skippack Creek. The EPA TMDL Document also refers to and includes a report generated by Hunter J. Carrick, Ph.D., suggesting certain limits on phosphorous for the Skippack Creek and the consequences of such limits on algal and nuisance growth. The report indicates that Dr. Carrick submitted the report to DEP on December 11, 2004. (EPA TMDL Document, Appendix D–6.; U.G.R.R. at 234a.)

### D. Procedural Background

Following the issuance of the EPA TMDL Document, the Authorities filed an appeal with EHB, naming *DEP* as respondent and challenging the TMDLs in the EPA TMDL Document. (L.S.R.R. at 267a–291a; U.G.R.R. at 299a–323a.) The Authorities made various averments in their appeals, including a reference to public hearings that "were held" in February 2005. UG averred that "[DEP] received timely comments from various members of the public" in response to draft TMDLs for Skippack Creek. (U.G.R.R. at 304a.) We note, however, that the EPA TMDL Document provides:

> EPA regulations require that the public must be allowed 30 days to review and comment prior to establishing a TMDL," and that "[a] public meeting was conducted on February 16, 2005 ... at the Skippack Township Building. During the meeting EPA presented details and answered questions regarding the proposed ... TMDLs. Based on

the inputs from interested parties and the general public on the proposed TMDL document, *EPA has addressed all comments and revised the TMDL report.*

(EPA TMDL Document; U.G.R.R. at 218a; emphasis added.)

■ The Authorities' appeals also included averments relating to EHB's purported jurisdiction, stating that EHB has jurisdiction over DEP "actions," and that, although the establishment of TMDLs bore characteristics of both a regulation and administrative "action," the establishment of TMDLs affected the Authorities' property rights and thereby provided EHB with jurisdiction over the appeal. (L.S.R.R. at 273a.) In fact, the Authorities claimed that, according to DEP, a party could not wait to challenge the methodology used to develop TMDLs in the course of a National Pollution Discharge Elimination System (NPDES) permit[6] proceeding. (L.S.R.R. at 274a.) Consequently, the Authorities argued that the only opportunity to challenge TMDLs (which would govern NPDES permit applications) is an immediate appeal from the decision establishing the TMDLs. (L.S.R.R. at 274a; U.G.R.R. at 306a.) The Authorities did not indicate whether EPA's final approval authority under Section 303(d) of the Act has any bearing on their position.

The Authorities averred that, despite the existence of the EPA TMDL Document, DEP, not EPA, actually established the TMDLs for Skippack Creek. (L.S.R.R. at 274a.) In making this claim,

---

**6.** The Act includes provisions relating to NPDES permits. NPDES permits "establish the amount of pollutants that each point source may discharge into Pennsylvania waters." *Borough of Bedford v. Dep't of Envtl. Protection,* 972 A.2d 53, 57–8 (Pa.Cmwlth. 2009). Under the Act, either the EPA or a state environmental agency may administer the NPDES permit process. *Id.* at 58. In Pennsylvania, DEP administers the NPDES system. *Id.* DEP has promulgated regulations pertaining to the issuance of NPDES permits. *Id.*

the Authorities pleaded facts indicating that the EPA TMDL Document described or established DEP's participatory role. Specifically, DEP employees were involved with the development of the TMDLs, DEP collected data (including information from a DEP "Nutrient Database") incorporated into the TMDL, and DEP made decisions regarding certain aspects of the development process such as sampling locations and TMDL "endpoints" and the "QUAL2K Model" used for nutrient TMDLs. Moreover, DEP's assessment of algal growth and determination of TMDL endpoints were critical in the development of the TMDLs. The Authorities' appeal also placed great significance on Dr. Carrick's report, because Dr. Carrick submitted the report to DEP, and the conclusions in his report regarding phosphorous concentrations provided a significant basis for the established TMDLs. (L.S.R.R. at 274a–280a.)

The Authorities made several other legal arguments in support of their position, urging that, even if EPA had actually issued the TMDLs, (1) the "actions" DEP took in participating in the process meant that EHB has the power to alter the established TMDLs (despite EPA's ultimate responsibility to approve TMDLs); (2) the establishment of the TMDLs, by operation of law, resulted in the incorporation of the TMDLs into DEP's "Continuing Planning Process" (CPP), and the CPP will affect the Authorities' rights; and (3) DEP has purportedly acknowledged in a Pennsylvania Bulletin notification that the TMDLs, whether established by DEP or EPA, constitute an "action" of DEP based upon the argument that DEP stated in a Pennsylva-

nia Bulletin notification, which provided that EPA's completion of the work on the TMDLs, and EPA's *approval* of the TMDLs, satisfied DEP's obligations under the Act. (L.S.R.R. at 280a–285a, specifically Para. 43(C)(1)(8).)

With regard to the merits, the bulk of the Authorities' claim challenging the TMDLs rested on alleged problems in Dr. Carrick's analysis, which EPA (and/or DEP) used in the development of at least some of the TMDLs.

In response to the appeal, DEP filed a Motion to Dismiss, arguing that EHB did not have jurisdiction. DEP argued that it was EPA action, pursuant to the Consent Decree, that established the TMDLs, not a DEP action. EHB denied the Motion to Dismiss on October 24, 2005, concluding that factual issues remained regarding whether EPA or DEP established the TMDLs.[7] (L.S.R.R. at 539a–554a.)

The parties engaged in discovery, and, thereafter, on July 24, 2006, DEP filed a motion for summary judgment, raising again the question of whether EHB had jurisdiction over a challenge to the TMDLs. EHB denied the motion in a September 18, 2006 order, concluding that the Act and the Consent Decree gave ultimate responsibility for establishing TMDLs to the Commonwealth. (L.S.R.R. at 920a–934a.) The Authorities, during the course of discovery that followed, provided expert reports regarding their challenge to the TMDLs. The Authorities assert that, on January 8, 2007, DEP indicated in a conference call that the TMDLs were to be withdrawn shortly.[8]

7. DEP filed an application for reconsideration with a request to amend its order to permit interlocutory review by this Court, and the EHB denied that application on November 17, 2005. On December 14, 2005, DEP filed with this Court a petition for review of the

EHB's order denying reconsideration and an amending order. On January 10, 2006, this Court denied that petition for review.

8. We note also that in May 2007, the EPA filed an "Unopposed Motion to Modify Con-

On or around September 27, 2007, *EPA* sent a letter to DEP indicating that it was withdrawing the TMDLs and issued a document called "Decision Rationale for the Withdrawal of the Nutrient TMDLs for the Skippack Creek Watershed" (TMDL Withdrawal Document; L.S.R.R. at 437a–467a). The letter accompanying the TMDL Withdrawal Document provided in pertinent part:

> Since EPA established the nutrient TMDLs in 2005, the fundamental equation that was used for determining the in-stream endpoint (sufficient to achieve beneficial water uses and criterion) has been modified by its authors for valid scientific reasons ... Since the TMDLs were established by the EPA, additional water quality modeling and literature review shows that it would be appropriate to further review other approaches to establishing the TMDL endpoint, the contributions of nonpoint sources and several other factors that may impact the growth of algae, such as shading and flooding events.

> EPA is withdrawing the existing TMDLs that were established by EPA in 2005 ... based on our determination that the 2005 nutrient TMDLs were not sufficient to attain and maintain existing water quality standards and water uses. EPA will re-evaluate the nutrient TMDLs ... by June 30, 2008.

(U.G.R.R. at 420a; emphasis added.)

On January 6, 2009, the parties entered into a Stipulation of Settlement that essentially provided:

1. EPA withdrew the TMDLs;

2. DEP and the Authorities believe respectively that EPA or DEP established the TMDLs for Skippack Creek;

3. the parties agreed to withdrawal of the appeal to avoid further litigation;

4. the settlement provides for withdrawal "without prejudice to the Authorities to raise any and all factual or legal issues raised" in any future appeals involving the development of application of the Skippack TMDLs, and DEP retains any and all defenses; and

5. the Authorities retain the right to seek attorneys' fees and costs, and DEP retains any defenses pertinent thereto.

(L.S.R.R. at 935a–939a.)

■ Based upon the stipulation, on January 23, 2009, EHB issued an order dismissing the appeal. (L.S.R.R. at 942a.) The Authorities filed separate applications for attorneys' fees under Section 307(b) of the Clean Streams Law. (L.S.R.R. at 944a–1134a). EHB denied the applications without hearing, concluding that EPA, rather than DEP, had withdrawn the TMDLs for Skippack Creek. (L.S.R.R. at 1455a–1467a.) The Authorities requested reconsideration of EHB's denial. (L.S.R.R. at 1469a–1482a.) EHB denied reconsideration on July 10, 2010. (L.S.R.R. at 1485a–1489a.) LS filed a timely petition for review with this Court, challenging EHB's order denying its fee application. As noted above, UG filed a petition for review challenging only EHB's order denying reconsideration.[9]

---

sent Decree to Extend Deadline" in the Pennsylvania federal litigation. In its brief, LS characterizes the Motion to Modify the Consent Decree as "EPA's request for an extension of the deadline to complete the establishment of the final TMDLs." LS points out, however, that the Motion also acknowledges that the Act requires states to establish TMDLs.

9. Although UG acknowledged during oral argument that it had only sought this Court's review of the EHB's denial of reconsideration, its brief in support of its petition for review addresses the merits and purports to challenge the EHB's decision denying its fee application in addition to the EHB's denial of reconsideration. Even if UG had included a challenge to the fee application decision in its

## II. *DISCUSSION*

### A. Appeal of EHB's January 5, 2010 Orders Denying Reconsideration

We first address UG's challenge to EHB's denial of reconsideration. Our standard of review of that decision is limited to considering whether EHB abused its discretion in denying reconsideration. *West Penn Power Comp. v. Pub. Utility Comm'n*, 659 A.2d 1055 (Pa.Cmwlth.1995). An abuse of discretion occurs only when a decision reflects bad faith, fraud, capricious action, or an abuse of power. *Id.* at 1065. UG argues that EHB erred in rendering its decisions without first conducting a hearing to determine various factual issues, such as whether DEP was responsible for EPA's decision to withdraw the TMDLs. We cannot conclude that UG has raised any issues that suggest that EHB's decisions denying reconsideration reflect bad faith, fraud, abuse of power, or caprice. Consequently, we affirm EHB's denial of reconsideration.

### B. LS's Appeal of EHB's December 15, 2001 Order Denying LS's Application for Attorney's Fees and Costs

On appeal,[10] LS raises the following issues in its petition for review:

1. Whether EHB applied an improper standard in analyzing LS's fee application?

2. Whether EHB erred in its application of the standard it applied?

3. Whether EHB erred in concluding that EPA, rather than DEP, withdrew the TMDLs (1) without first holding a hearing and (2) by basing that determination on the stipulation that EPA had withdrawn the TMDLs?

4. Whether EHB erred as a matter of law in concluding that LS did not satisfy its burden of proof in its claim for attorneys' fees and costs under Section 307(b) of the Law?

5. Whether the "law of the case" doctrine precluded EHB from concluding that EPA withdrew the TMDLs in light of EHB's prior decisions denying DEP's motions to dismiss and for summary judgment?

6. Whether EHB's determinations that EPA will reestablish the TMDLs for Skippack by June 30, 2008, and that the TMDLs were withdrawn because it was not strict enough are against the weight of the evidence?

#### 1. Standard Applicable to Applications for Attorneys' Fees and Costs

■ In *Kwalwasser v. Department of Environmental Resources*, 131 Pa.Cmwlth. 77, 569 A.2d 422, 424 (1990), this Court developed a four-factor test for determining when a party is entitled to fees and costs under Section 4(b) of the Surface Mining Conservation and Reclamation Act:[11] (1) EHB must have issued a final

---

petition for review, its petition for review is untimely as to that decision. Consequently, with respect to UG's appeal, we are limited in our review to the challenge to the EHB's decision denying reconsideration.

10. In reviewing the EHB's order denying LS's fee application, our consideration is limited to determining whether the EHB abused its discretion in denying the award. *Solebury Twp. v. Dep't of Envtl. Protection*, 593 Pa. 146, 158, 928 A.2d 990, 997 (2007).

11. Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. § 1396.4(b). Although the Surface Mining Conservation and Reclamation Act and its fee-shifting provisions are not at issue here, we note that our Supreme Court in *Solebury* observed that different statutory fee-shifting provisions may require the application of different standards, depending upon the specific language of the particular fee-shifting provision. *Kwalwasser,* therefore, provides guidance for our analysis but does not establish an inflexible test that binds us.

order; (2) the applicant for fees and costs must be the prevailing party; (3) the applicant must have achieved some degree of success on the merits; and (4) the applicant must have made a substantial contribution to a full and final determination of the issues.

More recently, in *Solebury,* our Supreme Court approved the use of these factors, but concluded that this Court had applied the four factors too conservatively. The Supreme Court noted first that, based upon the language of Section 307(b) of the Law, EHB's discretion to award attorneys' fees also encompasses its ability to adopt standards by which it may evaluate fee requests. Nevertheless, the Supreme Court observed that Section 307(b) of the Law did not contain language used in other federal fee-shifting statutes limiting the definition of the term "prevailing party." Therefore, because the language of the federal fee-shifting laws did not track our own and did not clearly reflect the same public policy underlying our fee-shifting provision, our Supreme Court held that the decisions interpreting those federal laws could not support EHB's narrow application of the *Kwalwasser* test with regard to a request for fees under Section 307(b) of the Law.

In reviewing this Court's decision, the Supreme Court agreed with us "that the practical relief sought ... should be considered when characterizing [the requesting party] as [a] prevailing part[y] for the purpose of the *Kwalwasser* test." *Solebury,* 593 Pa. at 170, 928 A.2d at 1004. In assessing this question, however, our Supreme Court looked with approval to Justice Ginsburg's dissent in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), wherein Justice Ginsburg opined that a formal declaration

that a party is correct on the merits is not necessary when "the ultimate goal of litigation is not an arbiter's approval, but a favorable alteration of actual circumstances." *Id.* at 170, 928 A.2d at 1005 (quoting *Buckhannon,* 532 U.S. at 633, 121 S.Ct. 1835 (Ginsburg, J., dissenting)). Thus, our Supreme Court opined that if and when applying the *Kwalwasser* standard under Section 307(b) of the Law, EHB should not limit its consideration of whether a party "prevailed" to situations in which a party obtains an actual judgment or consent decree.

Of importance to our review in this case is the Supreme Court's comment that "EHB's exclusive focus on the dismissal of the case as moot, without conducting a hearing or making further factual findings and legal conclusions, does not justify its holding that [Solebury] did not achieve some degree of success on the merits and did not make a substantial contribution to the full and final determination of the issues." *Id.* Ultimately, the Supreme Court summarized its conclusion, noting that EHB's application of *Kwalwasser* was too narrow, based upon the broader language of Section 307(b) of the Law and the public policy favoring liberal construction of the provision. The Supreme Court indicated that the record was insufficient to review EHB's decision and directed a remand to EHB.

EHB in this case noted the Supreme Court's decision in *Solebury,* observing two key principles: (1) a party need not obtain a formal final judgment or consent decree in the underlying litigation, and (2) because the Supreme Court accepted Justice Ginsburg's dissenting view in *Buckhannon,* the Supreme Court thereby indicated that EHB could incorporate Justice Ginsburg's "catalyst" approach in analyzing fee-shifting applications. EHB summarized the so-called "catalyst" rule as

follows: (1) the applicant must show that the opposing party provided some of the benefit the fee-requesting party sought in the underlying suit, (2) the applicant must show that the suit stated a genuine claim, and (3) the applicant must show that the suit was a substantial or significant reason why the opposing party, voluntarily or otherwise, provided the benefit or partial benefit that the fee-requesting party sought in the underlying suit. EHB opined that the "catalyst" analysis was more liberal than the *Kwalwasser* test and consistent with the direction in *Solebury* to take into account the public policy of Section 307(b) of the Law favoring a liberal construction of fee-shifting provisions. *Solebury*, 593 Pa. at 170, 928 A.2d at 1004.

We conclude that EHB did not err in electing to use the catalyst approach in reviewing LS's fee application. The primary distinction between a liberal *Kwalwasser* analysis and EHB's catalyst approach is that the latter requires a fee-seeking party to demonstrate that the opposing party in the underlying action provided some of the relief the fee applicant sought in the litigation. We do not view the inclusion of this additional requirement as veering substantially from the Supreme Court's directive to apply *Kwalwasser* more liberally. Federal decisions arising before *Buckhannon* (which applied a more relaxed standard to determine whether a party was "prevailing," as reflected in the *Buckhannon* dissent), refer to a 1987 decision of the United States Supreme Court, *Hewitt v. Helms*, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), wherein the Supreme Court interpreted the term "prevailing party" as one whose lawsuit

sometimes produces *voluntary action by the defendant* that affords the plaintiff all or some of the relief he sought through a judgment—e.g., a monetary settlement or a change in conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.

*Hewitt*, 482 U.S. at 760–61, 107 S.Ct. 2672 (emphasis added).

EHB's catalyst approach reflects both our Supreme Court's directive not to limit fee awards to judgment or consent decree situations and the United States Supreme Court's reference in its pre-*Buckhannon* decision in *Hewitt* to permit fee awards based upon "voluntary action by [a] defendant." [12]

## 2. EHB's Application of the Catalyst Approach

 Although we conclude that the catalyst approach is a reasonable method by which EHB may consider a request for attorneys' fees under Section 307(b) of the Law, we must consider whether EHB erred in its application. The first issue, then, is whether EHB was correct in concluding that LS was not a prevailing party based upon the solitary fact that EPA withdrew the TMDLs and that DEP did not provide "some of the benefit sought," *Buckhannon*, 532 U.S. at 627, 121 S.Ct. 1835, by the lawsuit.

DEP, in addressing this issue, refers us to the United States Court of Appeals for the Ninth Circuit decision in *Idaho Conservation League, Inc. v. Russell*, 946 F.2d

---

12. Requiring some nexus between the action that triggered the favorable result and the party against whom fees are sought appears to also comport with a sense of fundamental fairness. It seems unduly harsh and punitive to require an opposing party to pay attorneys' fees and costs under a fee-shifting provision, where, due *solely* to actions of a third-party, the applicant achieves a favorable result that renders moot its claim against the party from whom fees are sought.

717 (9th Cir.1991). In that case, an environmental group initiated an action against EPA under the Act, asserting that EPA failed to perform a mandatory duty to issue water quality regulations for the state of Idaho. The state of Idaho intervened in the matter. After the environmental group reached an agreement with the state of Idaho, whereby Idaho would adopt water quality standards, the environmental group moved to dismiss its lawsuit against EPA, but also sought attorneys' fees from EPA. A federal district court granted that application. EPA appealed the decision to the Ninth Circuit, which reversed the award of attorneys' fees. The Ninth Circuit applied the catalyst rule, observing that all an applicant for fees needs to demonstrate is that the fee-seeking party obtained the relief it sought in the lawsuit as a consequence of bringing the lawsuit and that the lawsuit had a genuine basis in law.

The Ninth Circuit reasoned that, in considering fee requests, courts should look to the objective of the plaintiff in bringing the lawsuit and what the plaintiff actually obtained as a result of the lawsuit. This inquiry involves an examination of cause and effect. In the matter before it, the environmental group obtained what it was seeking in the lawsuit—state water quality standards. The court reflected upon EPA's failure to comply with the Act's mandate that EPA should promulgate water quality regulations if a state fails to do so. *Id.* at 720.

The Ninth Circuit, however, agreed with EPA that in order to constitute a prevailing party, a party *must prevail over a party against which it brought its lawsuit.* Relying upon a United States Supreme Court decision, *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), the Ninth Circuit noted that the traditional view in fee-shifting

applications warrants the award of fees *against the losing party*—the party responsible for providing relief on the merits. In other words, in any litigation, there might be more than one party from which a plaintiff seeks relief, but the plaintiff will only be prevailing as to those defendants which ultimately provide some of the relief, including the practical relief, requested. *Id.* at 720–21.

The Ninth Circuit acknowledged that the environmental group's lawsuit acted as a catalyst that prompted an opposing party (the state of Idaho) to take action, but the lawsuit never prompted the party from which the group sought fees, EPA, to provide the relief the group sought. *Id.* at 721. In other words, as stated in the *Buckhannon* dissent, the environmental group did not demonstrate that the party from which it sought fees "provided some of the benefit" sought in the lawsuit.

■ Distilling the principles from the holdings in the *Buckhannon* dissent and *Idaho Conservation League,* we summarize the burden of a party seeking to obtain· attorneys' fees under the law as follows: The party must demonstrate that (1) the lawsuit brought about a change in an opposing party's conduct, and that (2) the change in conduct caused the plaintiff to obtain some of the relief it sought. With regard to the first requirement, this element is essentially the same as the third element EHB identified—that the applicant's lawsuit was a significant factor in prompting an opposing party to alter its conduct. Both of these elements are relative to the essential question of whether an applicant for a fee award was a "prevailing party."

In her dissenting view in *Buckhannon,* Justice Ginsburg opined that the plaintiffs, who had brought a lawsuit challenging a state law against the state of West Virginia and certain state agencies, constituted

prevailing parties. The plaintiffs alleged in their fee-award application that their lawsuit caused the state legislature, technically a *non-party*, to change the law that the plaintiffs challenged in their lawsuit.

The facts in this case are somewhat similar to those in *Buckhannon* in that EPA here, a non-party, by virtue of its own clear statements in the TMDL Withdrawal Document, took the direct action that provided the Authorities with the relief they were seeking. This case is, nevertheless, distinct. In *Buckhannon,* the state legislature certainly was closely connected with the defendant parties (the state and state agencies) against which the plaintiffs brought their claim. In this case, EPA and DEP, other than having similar roles within the respective federal and state governments, are not similarly connected. In *Buckhannon,* the state had created the challenged law, and it had the power to amend the law. In this case, although LS contests the question of whether EPA or DEP established the TMDLs, the record is clear that EPA *withdrew* the TMDLs.

◼ Nevertheless, we do not believe that we are constrained to preclude plaintiffs (LS) from seeking fee awards from a defendant (DEP) that may have played a role in the decision-making process by a non-party (EPA), which ultimately provides relief that the plaintiff had sought from the defendant. We believe the catalyst rule can be applied in certain circumstance where a plaintiff obtains some of the relief it sought through a lawsuit from a non-party *as a result of some action or change of conduct* by the party against which the plaintiff brought the lawsuit.

In this case, the catalyst rule warrants an examination of the question of whether the lawsuit against DEP triggered EPA's action to withdraw the TMDLs,[13] because if LS can establish a significant cause and effect relationship between DEP's conduct and EPA's withdrawal, the facts could demonstrate that DEP "provided some of the benefit" LS sought.

Because the documents we have reviewed strongly suggest the primary role EPA had in establishing, approving, and withdrawing the TMDLs, the connection between DEP's conduct and EPA's decision to withdraw the TMDLs must be significant to warrant an award of attorneys' fees. The record in this case casts some doubt as to DEP's power to have effectuated on its own any of the relief LS sought. If DEP had no power to effectuate change on its own, the awarding of attorneys' fees and costs would appear to be unjust. Although the Act places primary responsibility on a state to establish TMDLs, the Consent Decree and the MOU also provided EPA with the power to establish the TMDLs, which from the record appears to be exactly what happened here.

Even more significant is the fact that the Act itself places with EPA the ultimate power to *approve* TMDLs. This ultimate authority of EPA raises the question of whether, even if DEP had established the TMDLs, DEP could take any action to withdraw the TMDLs once EPA approved them. Consequently, if DEP has no legal authority to effectuate or direct EPA to

13. DEP and LS assert, respectively, that the EPA was prompted to withdraw the TMDLs based upon (1) information it received from non-litigant third parties relating to a change to the "Dodds Regression" (DEP Surreply in Opposition to Appellants' Applications for Attorneys' Fees and Costs at 1–2; Original Record Tab 15), and (2) indications that the report of Dr. Carrick identified in the EPA TMDL Document was based upon erroneous assumptions.

approve or withdraw TMDLs, then there appears to be no change in conduct on the part of DEP that would have resulted in LS obtaining any or some of the relief it sought in its action against DEP. Nonetheless, because we conclude that EHB was too restrictive in its analysis under the catalyst approach, on remand, EHB will have to grapple with the question of whether DEP's involvement in EPA's decision-making process was sufficient to justify an award of attorneys' fees in this case.

In summary, we conclude that EHB did not err in electing to apply the catalyst approach to the fee applications, but it did so in an overly restrictive fashion. Because the *possibility* exists that DEP's conduct *may* have played a significant role in EPA's withdrawal decision, EHB must reconsider LS's fee application to determine what, if any, role DEP's conduct played in the decision. If EHB determines that some conduct on the part of DEP was a significant factor in EPA's withdrawal decision, then EHB could conclude that LS is entitled to an award of fees. In order to fulfill this requirement, EHB must consider whether the current record is sufficient to support necessary factual findings on this issue. If the record is not sufficient, EHB must conduct a hearing in order to supplement the record to support the findings necessary for reconsideration of LS's application.

### C. Additional Issues

#### 1. *Law of the Case*

■■■■ LS also argues that EHB violated the law of the case doctrine by altering its legal conclusion regarding whether DEP or EPA was responsible for establishing the Skippack Creek TMDLs. LS argues that EHB had earlier concluded that, although both DEP and EPA may have contributed to the development of the TMDLs, by operation of the Law, DEP

must be the party "responsible" for the TMDLs. DEP argues that the doctrine does not apply to later decisions by the same judicial officer (or office). The "law of the case" doctrine:

> refers to a family of rules which embody the concept that a court involved in the later phases of a *litigated* matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. See 21 C.J.S. Courts § 149a; *5 Am. Jur.2d Appeal and Error § 744.* Among the related but distinct rules which make up the law of the case doctrine are that: (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

*Com. v. Fletcher,* 604 Pa. 493, 986 A.2d 759, 776 n. 20 (2009) (emphasis added) (citing *Com. v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1331 (Pa.1995), and *Com. v. Wallace,* 582 Pa. 234, 870 A.2d 838, 847 (2005)).

Further, our Supreme Court has commented regarding the doctrine as follows:

> [W]hen an appellate court has considered and decided a question submitted to it upon appeal, it will not, upon a subsequent appeal on another phase of the same case, reverse its previous ruling even though convinced that it was erroneous.... It is not, however, inflexible. It does not have the finality of the doctrine of *res judicata....* The rule of "the law of the case" is one largely of

convenience and public policy, both of which are served by stability in judicial decisions.... Thus there is an abundance of authority to the effect that where a prior decision is palpably erroneous, it is competent for the court, not as a matter of right but of grace, to correct it upon a second review ... where, following the decision on a former appeal, the court in another case has laid down a different rule either expressly or by necessary implication overruling the previous decision.

*Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 394–95, 100 A.2d 595, 598 (1953) (citations omitted) (quoting *Reamer's Estate*, 331 Pa. 117, 122–23, 200 A. 35, 37–38 (1938)).

EHB's decision did not alter a resolution by an appellate court. Further, although the question EHB decided in addressing DEP's motion to dismiss and summary judgment motion was legal in nature, we do not perceive the matter as having been "transferred" between adjudicators of coordinate jurisdiction. Further, as noted above, where a court determines that an earlier decision is wrong, the doctrine does not necessarily preclude an alternative resolution by a different court. EHB here, based upon a fuller record and review of pertinent documents concluded that DEP was not "responsible" for the withdrawal of the TMDLs for the purpose of considering whether the Authorities are entitled to attorneys' fees. Therefore, we do not believe the doctrine was applicable to EHB's resolution of the application for attorneys' fees.

### 2. State's Duty Under Section 303(d) of the Act

Additionally, LS asserts that EHB erred when it ignored the language of Section 303(d) of the Act, which vests states with the duty to establish TMDLs. We believe that our discussion above essentially addresses this argument. We also observe that whether the Act vests *only* the states with such a duty is irrelevant if DEP had no authority to withdraw TMDLs established and approved by EPA.

### 3. Legal Effect of EPA's Stated Intent to File More Stringent TMDLs in the Future

 LS also asserts that EHB erred in basing its decision in part upon the comment in the Decision Rationale that EPA intended to establish more stringent TMDLs in the future. We conclude that LS is correct in this regard. The focus of EHB's inquiry should be on whether LS obtained from DEP some of the relief it sought. Although the question remains whether LS has or can establish that it obtained relief from DEP, the withdrawal did provide LS with the relief it was seeking. EPA's action essentially created a "clean slate," and the speculative question of whether future TMDLs are more or less stringent is not relevant to the discrete issue of whether LS obtained relief, albeit possibly relief of an impermanent nature. If either EPA or DEP establish TMDLs in the future, LS may need again to challenge such action.

### III. CONCLUSION

EHB must reconsider LS's fee application in the manner described above, addressing the factual question of whether DEP's conduct had some influence upon EPA's ultimate decision to withdraw the Skippack Creek TMDLs, and if so, the degree to which DEP's conduct caused EPA to withdraw the TMDLs. If necessary, EHB must conduct a hearing on the factual questions necessary to resolve these issues. Accordingly, we will vacate EHB's order with regard to LS and remand the matter to EHB with the direction to take any action, including con-

ducting a hearing, necessary to resolve the matter consistent with this opinion.

### ORDER

AND NOW, this 30th day of November, 2010, the order of the Environmental Hearing Board, dated January 5, 2010, denying the Upper Gwynedd Towamencin Municipal Authority's motion for reconsideration, is hereby AFFIRMED. The order of the Environmental Hearing Board, dated December 15, 2009, denying Lower Salford Township Authority's application for recovery of attorneys' fees and costs is hereby VACATED, and the matter is REMANDED to the Environmental Hearing Board for additional proceedings on Lower Salford Township Authority's application for attorneys' fees and costs, consistent with the accompanying opinion.

Jurisdiction relinquished.