CHALFONT–NEW BRITAIN JOINT
SEWAGE AUTHORITY,
Petitioner

v.

DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
Respondent.

Borough of Lansdale, Petitioner

v.

Department of Environmental
Protection, Respondent.

Hatfield Township Municipal Authority,
Horsham Water and Sewer Authority,
Bucks County Water and Sewer Au-
thority, Warrington Township Water
and Sewer Department, and Warwick
Township Water and Sewer Authority,
Petitioners

v.

Department of Environmental
Protection, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 10, 2011.
Decided June 15, 2011.
Reargument Denied Aug. 8, 2011.

Steven A. Hann, Lansdale, for petitioners Bucks County Water & Sewer Authori-

ty, Hatfield Township Municipal Authority, Horsham Water & Sewer, Warrington Township Water & Sewer Department, and Warwick Township Water & Sewer Authority.

Richard T. Abell, King of Prussia, for petitioner Chalfont–New Britain Joint Sewage Authority.

Steven T. Miano, Philadelphia, for petitioner Borough of Lansdale.

William H. Gelles, III, Norristown, for respondent.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

Chalfont–New Britain Joint Sewage Authority, Borough of Lansdale, Hatfield Township Municipal Authority, Horsham Water and Sewer Authority, Bucks County Water and Sewer Authority, Warrington Township Water and Sewer Department, and Warwick Township Water and Sewer Authority (collectively, Petitioners) petition for review of the August 25, 2010, order of the Environmental Hearing Board (EHB), which denied Petitioners' request for costs and attorney's fees under section 307(b) of the Clean Streams Law (Law).[1] We reverse.

Petitioners own and operate publicly owned sewage treatment works in the Neshaminy Creek watershed. In 1996,

[1]. Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. § 691.307(b). Section 307(a) of the Law prohibits the discharge of industrial wastes into the waters of the Commonwealth without a permit. 35 P.S. § 691.307(a). Section 307(b) of the Law provides, in part, as follows:

Any person having an interest which is or may be adversely affected by any action of the department under this section may proceed to lodge an appeal with the [EHB]. . . . The [EHB], upon the request of any party, may in its discretion order the payment of costs and attorney's fees it determines to have been reasonably incurred by such party in proceedings pursuant to this act.

the Commonwealth listed Neshaminy Creek and its tributaries as impaired waters, identifying nutrients as the cause of the impairment. Pursuant to a federal consent decree, the Environmental Protection Agency (EPA) was required to ensure that Total Maximum Daily Load Assessments (TMDLs) · be established for impaired waters by 2007.[2] (Findings of Fact, Nos. 67–71.)

In December 2003, the Department of Environmental Protection (DEP) submitted for review and approval to the EPA a TMDL for the Neshaminy Creek Watershed. The EPA approved the TMDL, but Petitioners challenged the TMDL by filing appeals with the EHB.[3] (Findings of Fact, Nos. 1–4, 10–11, 14.) In their appeals, Petitioners express the concern that the TMDL should be scientifically sound and that permit limits should not be revised in short order because making changes to publicly owned sewage treatment works can be expensive. (Findings of Fact, Nos. 75–76.)

On April 14, 2004, DEP met with all Petitioners, except Chalfont[4] (the non-Chalfont Petitioners), pursuant to an EHB order to discuss settlement. DEP offered to stipulate that, if the non-Chalfont Petitioners agreed to dismissal of their appeals, DEP would agree not to object to

their raising similar issues in any later appeal of the TMDL or in an appeal of a permit containing the TMDL. The non-Chalfont Petitioners raised concerns that, if they withdrew their appeals or agreed to their dismissal, the EHB may lack jurisdiction in a later appeal, and/or the doctrine of administrative finality would restrict their ability to raise the same issues. (Findings of Fact, Nos. 8, 59–60.)

On June 8, 2004, DEP met again with the non-Chalfont Petitioners. DEP stated at the meeting that, in the course of responding to discovery requests, DEP had discovered a modeling error involving the "k-rate," which is a variable and calibration parameter in the model that measures the phosphorus loss rate.[5] DEP further stated that it intended to revise the TMDL to correct the error and that the process would take approximately six months. The parties again discussed settlement, but DEP would not agree to withdraw the flawed TMDL or postpone issuance of permits based on the flawed TMDL. As a result, the EHB stayed litigation pending revision of the TMDL and ordered the parties to continue to make reasonable efforts to resolve disputed issues during the stay. (Findings of Fact, Nos. 15–19, 61.)

2. A TMDL is a planning document that outlines a pollutant budget for a watershed; a TMDL does not impose discharge requirements on dischargers until it is implemented in a permit.

3. The TMDL set a pollutant budget for total phosphorus and allocated a portion of that amount to each point source discharger in the watershed. The goal was a 20% reduction in total phosphorus at the mouth of the watershed, which meant a monthly average of 1.0 mg/L of total phosphorus at existing flows and 0.8 mg/L of total phosphorus at full permitted capacity. Petitioners' existing permits contain phosphorus limits of 2.0 mg/L, so the

TMDL of 0.8 mg/L is a 60% reduction in Petitioners' permit limits. (Findings of Fact, Nos. 72–74.)

4. Chalfont was a member of the PA Periphyton Coalition, which was attempting to work independently with DEP and the EPA on the development of a new TMDL for the Neshaminy Creek watershed. DEP and Chalfont had separate settlement discussions. (Findings of Fact, Nos. 63, 66.)

5. DEP mistakenly believed that phosphorus loss increases with increased flow, but phosphorus loss actually decreases with increased flow. (Findings of Fact, No. 78.)

DEP held additional meetings with the non-Chalfont Petitioners. In September 2004, DEP informed Chalfont about the revision efforts. Then, from October to December 2004, DEP exchanged information and comments with the Petitioners. On December 15, 2004, DEP informed the EHB that DEP was in a position to begin drafting the revised TMDL. (Findings of Fact, Nos. 20–31.)

In February 2005, DEP provided the non-Chalfont Petitioners with a proposed settlement document. During an April status conference with the EHB, the non-Chalfont Petitioners raised as a concern that, under DEP's proposal, DEP would not withdraw the admittedly erroneous TMDL. DEP believed that it could not withdraw the TMDL without the approval of the EPA.[6] The non-Chalfont Petitioners also were concerned about administrative finality should they withdraw their appeals and argued that the EHB should dismiss the litigation without prejudice. The EHB entered an order continuing the stay of proceedings. (Findings of Fact, Nos. 32–34, 80(g).)

In December 2005, DEP submitted a status report to the EHB, stating that it had not done a revised TMDL because data analysis of three rounds of sampling from the Neshaminy watershed taken during the summer of 2005 was not complete. In January 2006, DEP provided Petitioners with the Hunter Carrick Report containing the data analysis and advised that new model runs for the revised TMDL were in the process of being completed.[7] (Findings of Fact, Nos. 35–39.)

In June 2006, DEP filed a status report with the EHB stating that a draft TMDL

was circulating internally. The EHB vacated the stay, and the parties held settlement discussions, but, in August 2006, the EHB reinstated the stay pending completion of the TMDL revision process. On August 26, 2006, DEP released a draft TMDL for public comment. (Findings of Fact, Nos. 41–46.)

The draft TMDL was based on the methodology used to formulate the TMDL for the adjacent Skippack Creek watershed, which TMDL the EPA had nearly completed. The Skippack TMDL used a different methodology and different endpoint determination from the Neshaminy TMDL and from the work-in-progress revision to the Neshaminy TMDL. Thus, DEP did not ultimately adopt any of the proposed revisions discussed with Petitioners because DEP wanted the Neshaminy TMDL to be consistent with the Skippack TMDL. (Findings of Fact, Nos. 80(h)-80(i), 80(k)–80(l).)

During the public comment period, DEP learned from comments by some of the Petitioners that the "Dodds equation," which was used by the EPA in establishing the Skippack TMDL, had been revised due to an error. The error meant that the endpoint in the Skippack TMDL was incorrect. Thus, the EPA decided that the best course of action was to withdraw the nutrient portion of the Skippack TMDL. (Findings of Fact, Nos. 80(n)-80(o).)

Because the Neshaminy TMDL was based on the same equations as the Skippack TMDL, DEP abandoned its efforts to revise the Neshaminy TMDL. DEP proposed to the EPA the withdrawal of the nutrient portion of the Neshaminy TMDL

---

6. The EPA had informed DEP that it preferred the submission of a replacement TMDL rather than simply the withdrawal of the current TMDL. (Findings of Fact, No. 80(f).)

7. In February 2006, the non-Chalfont Petitioners requested raw data for the Hunter Carrick Report, the new modeling data and information about any other work being conducted. DEP complied with the request.

and the August 26, 2006, draft revision of the Neshaminy TMDL. (Findings of Fact, Nos. 80(p)-80(s).)

On August 18, 2007, DEP published notice of the proposed withdrawal of the nutrient portion of the Neshaminy TMDL. In September 2007, DEP submitted its rationale for the withdrawal to the EPA. In February 2008, DEP received approval from the EPA. In April 2008, DEP published notice of the withdrawal. The parties negotiated and submitted a stipulation of settlement to the EHB, and, in October 2008, the EHB entered an order of dismissal. Petitioners' efforts in connection with their appeals were a substantial factor in bringing about DEP's voluntary withdrawal of the nutrient portion of the Neshaminy TMDL. (Findings of Fact, Nos. 47–53, 81–82.)

In November 2009, Petitioners filed applications for attorney's fees and costs pursuant to section 307(b) of the Law. Petitioners later moved to amend their applications to reflect additional attorney's fees. (Findings of Fact, Nos. 54–56, 83–85.)

 The EHB utilized the "catalyst" approach [8] to decide whether Petitioners were entitled to receive attorney's fees and costs. This approach required the EHB to consider whether: (1) Petitioners had a genuine claim; (2) DEP provided some of the benefit sought by Petitioners; and (3)

Petitioners' appeals were a substantial cause of DEP's action. The EHB concluded that Petitioners were not entitled to attorney's fees and costs because, although DEP provided some of the benefit sought by Petitioners, i.e., the withdrawal of the Neshaminy TMDL, that benefit was only temporary. The EHB also denied Petitioners' attorney's fees and costs because their appeals did not advance the goal of the Law to end water pollution and because Petitioners could have settled the appeals but chose not to do so.[9] Having determined that Petitioners were not entitled to attorney's fees and costs, the EHB denied as moot Petitioners' motions to amend their applications. Petitioners now petition this court for review.[10]

## I. Temporary Benefit

 Petitioners argue that the EHB erred in denying their applications based on the EHB's conclusion that the withdrawal of the Neshaminy TMDL was only a temporary success for Petitioners, i.e., because there would be another, more stringent TMDL at some point in the future. We agree.

This court addressed this same issue in *Upper Gwynedd Towamencin Municipal Authority v. Department of Environmental Protection,* 9 A.3d 255 (Pa.Cmwlth. 2010). In that case, we held that the EHB

8. The "catalyst" approach was stated in the dissenting opinion of Justice Ginsburg in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (Ginsburg, J., dissenting). This court approved the use of the "catalyst" approach by the EHB in *Upper Gwynedd Towamencin Municipal Authority v. Department of Environmental Protection,* 9 A.3d 255, 265 (Pa.Cmwlth.2010).

9. Petitioners also sought attorney's fees and costs because of bad faith and vexatious conduct by DEP, i.e., DEP's unwillingness to

withdraw the flawed TMDL. However, the EHB rejected the argument because DEP's failure to withdraw the TMDL was due to its good faith reliance on the EPA's stated preference for a replacement TMDL prior to withdrawal of the original TMDL.

10. The EHB has broad discretion with respect to an award of costs and attorney's fees. *Kwalwasser v. Department of Environmental Resources,* 131 Pa.Cmwlth. 77, 569 A.2d 422, 424 (1990). We will not overturn the EHB's exercise of discretion absent fraud, bad faith or a flagrant abuse of discretion. *Id.*

erred in denying attorney's fees and costs to a municipal authority based on the EPA's intention to establish more stringent TMDLs in the future. This court stated that the withdrawal of the flawed TMDL provided the relief sought, and the speculative question as to future TMDLs was not relevant to that issue. *Id.* at 269. Thus, under *Upper Gwynedd,* the EHB also erred in this case.

## II. Goal of Ending Water Pollution

■ Petitioners next argue that the EHB erred in denying their applications because DEP's withdrawal of the Neshaminy TMDL did not advance the statutory goal of ending water pollution. We agree.

Section 4(3) of the Law, 35 P.S. § 691.4(3), states that it is the objective of the Law to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted. Section 4(5) of the Law states that "[t]he achievement of the objective ... requires a comprehensive program of watershed management and control." 35 P.S. § 691.4(5). Section 5(a)(4) of the Law states that, in implementing the Law's policies, DEP must consider "[t]he state of scientific and technological knowledge." 35 P.S. § 691.5(a)(4).

In other words, the Law requires that its policies be achieved through a comprehensive and scientifically valid watershed management program. Here, the appeals by Petitioners raised concerns about the scientific validity of the Neshaminy TMDL, and, ultimately, DEP agreed that the Neshaminy TMDL was scientifically invalid and withdrew it. Thus, Petitioners' appeals **did** advance the Law's objectives.

11. Chalfont points out that it worked to settle matters outside the litigation through the PA

## III. Failure to Settle

■ Petitioners also argue that the EHB erred in denying their applications based on their failure to settle with DEP.[11] We agree.

Petitioners failed to settle because DEP would not withdraw a TMDL that everyone agreed was flawed. DEP refused to withdraw the TMDL because it believed that the EPA **preferred** waiting until a replacement TMDL had been set. However, eventually, DEP **did** withdraw the TMDL without a replacement.

Thus, Petitioners' demand that DEP withdraw the flawed TMDL was not unreasonable. In fact, the EHB stated, "We ... reject any notion that [Petitioners] acted in bad faith or unreasonably prolonged the litigation or adopted unreasonable settlement positions." (EHB's Op. at 21 n. 1.) Inasmuch as the EHB found Petitioners' settlement position to be reasonable, it makes no sense that the EHB would deny them attorney's fees and costs for their failure to settle.

## IV. Motions to Amend

■ Finally, Petitioners argue that the EHB erred in denying as moot their motions to amend their applications. We agree.

The EHB denied Petitioners' motions to amend as moot based on its erroneous conclusion that Petitioners were not entitled to attorney's fees and costs. Because the EHB erred in that regard, Petitioners' motions to amend the applications to reflect additional attorney's fees and costs were not moot.

Accordingly, we reverse.

Periphyton Coalition; thus, Chalfont's attorney's fees and costs are less than the others.

## ORDER

AND NOW, this 15th day of June, 2011, the order of the Environmental Hearing Board, dated August 25, 2010, is hereby reversed.